UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA            CRIMINAL NO. 09-cr-00037

VERSUS                              JUDGE HICKS

KEVIN J. MINNIEFIELD                MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

### Introduction

Defendant is charged by indictment with being a felon in possession of a firearm (a semi-automatic rifle) and ammunition. Doc. 2, Count 1. Before the court is Defendant's **Motion to Suppress (Doc. 25)**, which argues that the evidence was seized as a result of three or more illegal searches of Defendant's residence. For the reasons that follow, it is recommended that Defendant's motion be **denied**.

### The Facts

An evidentiary hearing was held on Defendant's Motion to Suppress on June 24, 2009. The court finds that the testimony at the hearing, as well as the police audio recordings of Defendant's encounter with the police (a summary prepared by the undersigned is attached hereto as Appendix 1), establishes the following facts. On December 15, 2007, Shreveport Police Officer Landry Ducote was dispatched to the patrol desk relative to a complaint of an assault and battery. Tr. 8. When he arrived at the desk, he saw a young lady who was crying and who had marks on her face. The young lady, who identified herself as Lashonda

Morgan, told Officer Ducote that her boyfriend, Kevin Minniefield (Defendant), had been holding her against her will for about a week and a half. Tr. 8-9. She told Officer Ducote that Defendant had been "hitting her with a handgun and a chair." Ms. Morgan's right eye was blackened, and she had a cut on the left side of her face near the temple. She also had lacerations to other parts of her body. Tr. 9. Ms. Morgan gave Officer Ducote the address to Defendant's residence as 2527 Emory Street, Shreveport, Louisiana. Ms. Morgan informed Officer Ducote that Defendant carried a 9 mm handgun and that he also had an assault rifle. Tr. 12.

Ms. Morgan told Officer Ducote that she escaped from Defendant's residence when Defendant left to go to the store. Tr. 10. She said that Defendant told her that when he returned from the store, he was going to make her perform some sort of sexual favor for money. Tr. 13. Officer Ducote believed that the information provided by Ms. Morgan established probable cause to arrest Defendant. Tr. 12.

Officer Ducote made a radio call to Shreveport Police Officers Ryan Robinson and Alvin Harvey. Officer Ducote advised the officers that a female claimed to have been held against her will and beaten with a handgun at Defendant's residence. Officer Ducote also told the officers that he needed them to check on the welfare of a five-month-old infant at the Emory Street residence. Tr. 18, 54. At the evidentiary hearing, Officer Ducote did not remember Ms. Morgan informing him that a five-month-old child was in the residence. However, after considering all of the evidence at the hearing (Tr. 20, 54, 61), especially the

uncontradicted testimony of Officers Robinson and Harvey, the court finds that Officer Ducote did inform the officers of the existence of the child, and that Officer Ducote simply forgot about that part of the incident. (Officer Ducote never left the police station. Tr. 12).

Officer Ducote told the officers that he believed there was probable cause to arrest Defendant if they were able to come in contact with him. Tr. 12. However, Officers Robinson and Harvey did not approach the house with intent to arrest Defendant. They intended to detain him for questioning by Officer Ducote. Tr. 31.

Officers Robinson and Harvey drove to Defendant's residence. According to the audio recordings (Defendant Exhibit 1), the officers arrived at Defendant's residence at approximately 18:51. The officers knocked on the front door, identified themselves as "police department," and issued a command to "open the door." Harvey Video 1, 18:51:43. A male voice responded by asking who was there, and the officers identified themselves as Shreveport Police. Tr. 21.

For the next two minutes, there was no further response from the occupants, but the officers did hear "a lot of moving around, shuffling inside the house." Tr. 21. Officer Harvey went to the back of the house, and Officer Robinson remained at the front door. Because of the sounds coming from the house, the nature of the call, and the length of time it was taking for someone to open the door, Officer Robinson drew his weapon. When Defendant finally opened the front door, Officer Robinson ordered him to the ground.

Tr. 23.  Officer Robinson then called Officer Harvey to let him know that he had made contact at the front door.

From the front door, the officers could see another male inside the residence, and they ordered him out as well.  Tr. 24, 33.  Both Defendant and the other man were placed in handcuffs.  Officer Harvey read Defendant his Miranda rights, Tr. 24, 56, while Officer Robinson entered the residence to check on the child and conduct a security sweep to ensure there were no other individuals inside the house.  Tr. 24, 36.  There were no other adults in the house, but during the security sweep, Officer Robinson observed a digital scale on the dresser in Defendant's bedroom, as well as a green leafy substance which was believed to be marijuana.  Tr. 27.  There was also a bulletproof vest on the bed.  Id.  Officer Robinson saw the child during the security sweep, but he did not bring the child outside into the December night "because it was cold outside."  Tr. 36.

After the security sweep was conducted, Officer Robinson asked Defendant for permission to retrieve the child from inside the house.  With Defendant's consent, Officer Robinson entered the home to retrieve the child and gave the child to Defendant's sister.  Tr. 25.  (Defendant's sister arrived at some point between the time handcuffs were placed on Defendant and the time Officer Robinson went inside to get the child.  Tr. 34.)  Defendant's sister then told Officer Robinson that she needed a car seat for the child.  Officer Robinson retrieved the car seat, which was located in the front room of the residence.  Robinson

Video 1, 19:01. The officers then told Defendant's family that they need to leave. Robinson Video 1, 19:02; Harvey Video 1, 19:02.

Defendant admitted that he has been advised of his rights, and the officers explained that he was not being arrested, but he was being detained. Robinson Video 1, 19:03. Officer Robinson then told Defendant that he saw marijuana in his bedroom and that he had "probable cause to search the house." Robinson Video 1, 19:03. Officer Robinson told Defendant to let him know if he was going to find something. Id.

Defendant's sister then asked the officers for permission to enter the home to retrieve clothes for the baby. Tr. 26-27. The officers told Defendant's sister that she would not be let into the house. Harvey Video 1, 19:04:30. One of the officers made an unintelligible reference to a "search warrant" during that conversation. Harvey Video 1, 19:04:30; Robinson Video 1, 19:04:30. Defendant told Officer Robinson that he (Officer Robinson) could get the baby clothes, and he told Officer Robinson where the clothes were located. Tr. 26-27. On Robinson Video 1, the officers discuss the whereabouts of the baby clothes. 19:04:33. While getting the clothes, the officers also saw baggies and the scale. 19:05. On Robinson Video 1, an officer states that they have not yet found a weapon, but they have Defendant on possession. 19:06:45. The officers are overheard looking for a bag in which to put the baby clothes. Robinson Video 1, 19:06:53.

During the initial security sweep, Officer Robinson saw two doors with padlocks on them. Tr. 27. One officer subsequently approached Defendant, who was in the backseat of a patrol car, and the following conversation ensued:

| | |
|---|---|
| Officer: | Look man, what's in the two doors with the padlocks on them? |
| Defendant: | Nothing. I can unlock them. |
| Officer: | Where the key at? On your key ring? |
| Defendant: | Can I step out (of patrol car)? |
| Officer: | No. |
| Defendant: | I don't know where they are. Might be in my pocket or in my jacket. You mind if I get a tee shirt? |
| Officer: | I've got the heater on for you. I'll get something. I'll get you a long sleeve. |

Harvey Video 1, 19:08:50.

Over the next few minutes, the officers looked for Defendant's keys to the padlocks. During the search for the keys, an officer asked Defendant, "silver keys?" Defendant answered, "yeah." Once the keys were found, an officer returned to Defendant and asked:

| | |
|---|---|
| Officer: | Uh, there any guns in there? |
| Defendant: | No. |
| Officer: | You sure? |
| Defendant: | (Apparently referring to another officer) There he goes, he's got the keys. |

Harvey Video 1, 19:13:20. Regrettably, the audio on the two recordings is very difficult (and sometimes impossible) to understand, but, after numerous careful reviews of both recordings, the court is satisfied that the above accurately reflects the only conversations between the officers and Defendant relative to the two locked doors.

At this point, the officers entered Defendant's residence with the keys to open the two locked doors. Once in the house, one officer said: "private conversation," and the audio recording temporarily stopped. Robinson Video 1, 19:14:40. The audio from Robinson Video 1 resumes at 19:15:59 (about a minute later)(with the sounds of a search being conducted), but the audio on Harvey Video 1 does not resume until 19:28.

Behind one of the locked doors was a surveillance camera that was wired to a computer in the front room. Tr. 28. This camera provided a full view of the front porch on a computer monitor. Tr.29. Behind the second locked door was a closet. In that closet, the officers found the loaded SKS semi-automatic rifle and other ammunition that is the subject of the federal indictment. Tr. 28-30; Robinson Video 1, 19:22:44. Also located in the closet was a large pink bowl containing suspected marijuana. Tr. 30.

As the evidence was being gathered, one officer described the process of obtaining Defendant's consent for the search: "Once I had plain view, I said anything in the house; no; do you mind if I look; no go ahead; he gave us consent; he gave us keys to unlock the doors." Robinson Video 1, 19:24:28. Later, when the evidence was being photographed on the hood of a patrol car, an officer stated: "He gave consent, like a dumbass." Harvey Video 1, 19:35.

A few minutes later, an officer stated: "He gave us the keys to unlock the doors." Harvey Video 1, 19:39:55.

**Defendant's Contentions**

Defendant's motion to suppress argues that Officer Robinson did not have legal justification to enter Defendant's home to conduct the security sweep when Defendant opened the door in response to the knock and talk. Defendant argues that the knock and talk was, at most, an investigatory stop, and the police did not have authority to pull Defendant out of his home and then search the home for "officer safety."

Defendant also argues that there is no evidence that Defendant gave consent to the officers to retrieve clothes for the child or to search Defendant's home. Defendant points out (and the Government concedes) that nowhere on the audio recordings from Officer Robinson or Officer Harvey is there any reference to Defendant's consent to enter the home to retrieve the baby clothes. Defendant, who did not testify at the suppression hearing, also argues that his statement that "I can unlock them" (the two padlocked doors) cannot be construed as consent to the search.

**Applicable Law**

To lawfully enter a home, "police officers need either a warrant or probable cause plus exigent circumstances." Kirk v. Louisiana, 536 U.S. 635, 638, 122 S.Ct. 2458 (2002). Probable cause is "defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'"

U.S. v. Webster, 162 F.3d 308, 331 (5th Cir. 1998), (quoting Gerstein v. Pugh, 420 U.S. 103, 111, 95 S.Ct. 854 (1975)). To determine whether exigent circumstances exist, the Fifth Circuit consider this non-exhaustive list of factors:

1.     the degree of urgency involved and the amount of time necessary to obtain a warrant;

2.     the reasonable belief that contraband is about to be removed;

3.      the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought;

4.     information indicating that the possessors of the contraband are aware that the police are on their trail; and

5.     the ready destructibility of the contraband and the knowledge that efforts to dispose of [contraband] and to escape are characteristic behavior of persons engaged in the [contraband] traffic.

U.S. v. Gomez-Moreno, 479 F.3d 350, 354 (5th Cir. 2007). The Supreme Court has held that the need to assist persons who are seriously injured or threatened with such injury is an exigency that obviates the need for a warrant. Brigham City v. Stuart, 547 U.S. 398 (2006); United States v. Troop, 514 F.3d 405, 409 (5th Cir. 2008); United States v. Castaneda, 2008 WL 2074060 (S.D. Tex. 2008). Exigent circumstances generally exist where there is a risk that the officers or innocent bystanders will be endangered, or that evidence will be destroyed. United States v. Blount, 123 F.3d 831, 837 (5th Cir. 1997)(en banc).

    In the absence of probable cause or exigent circumstances, the validity of a search depends on the voluntary consent of the suspect. Florida v. Royer, 460 U.S. 491, 496, 103 S.Ct. 1319 (1983). "The government bears the burden of proving the existence of voluntary

consent to a search; proof must be by a preponderance of evidence." U.S. v. Watson, 273 F.3d 599, 603 (5th Cir. 2001), citing U.S. v. Yeagin, 927 F.2d 798, 800 (5th Cir.1991). Additionally, "[i]t is not enough to show the mere existence of consent; the government also must show that 'consent was freely and voluntarily given.'" Id. at 604, quoting U.S. v. Ponce, 8 F.3d 989, 997 (5th Cir. 1993).

To determine whether consent was "freely and voluntarily given," the court must assess the "totality of the circumstances." U.S. v. Santiago, 410 F.3d 193, 199 (5th Cir. 2005). Voluntary consent need not be explicit; rather, a consent to search "may be in the form of words, gesture, or conduct." U.S. v. Young, 318 Fed. Appx. 407, 409 (6th Cir. 2009), quoting U.S. v. Griffin, 530 F.2d 739, 742, (7th Cir. 1976). But a defendant's mere acquiescence to a show of lawful authority is insufficient to establish voluntary consent. Bumper v. North Carolina, 391 U.S. 543, 548-49, 88 S.Ct. 1788 (1968); U.S. v. Gonzales, 842 F.2d 748, 754 (5th Cir. 1988), overruled on other grounds by U.S. v. Hurtado, 905 F.2d 74 (5th Cir. 1990) (en banc).

Another exception to the warrant requirement is the protective sweep doctrine. Maryland v. Buie, 494 U.S. 325 (1990). A protective sweep is a quick and limited search of premises conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding. Id at 327. An arrest is not always, or per se, an indispensable element of an in-home protective sweep.

<u>United States v. Gould</u>, 364 F.3d 578, 584 (5th Cir. 2004)(en banc). The requirements of a valid protective sweep are:

1. the police must have entered legally and for a legitimate law enforcement purpose;

2. the officers must have a reasonable, articulable suspicion that the area to be swept contains a person posing a danger to those on the scene;

3. the protective sweep must be limited to a cursory inspection of only those spaces where a person may hide (it is not a full search of the premises); and

4. officers must conclude the sweep once they have dispelled their reasonable suspicion of danger, and they may not continue the sweep after they are no longer justified in remaining on the premises.

<u>Id</u>. at 587; <u>United States v. Mata</u>, 517 F.3d 279, 286 (5th Cir. 2008); <u>United States v. Getachew</u>, 2009 WL 211288 (N.D. Tex. 2009).

**Analysis**

**A. Initial Entry Into the House (Recovery of the Child)**

Officers Robinson and Harvey did not have a warrant for Defendant's arrest, but the facts known to Officer Ducote (the dispatching officer) did given rise to probable cause for an arrest. Specifically, Defendant's girlfriend's statements to Officer Ducote concerning being held against her will and beaten (with a gun) by Defendant, as well as Officer Ducote's observations of the bruises and marks on her body, gave rise to probable cause to arrest Defendant for (at a minimum) assault and battery. Nevertheless, despite the existence of probable cause, Officers Robinson and Harvey approached the house only to conduct a

"knock and talk" and check on the welfare of the five month old baby. Their decision to pursue that course of action was reasonable.

Once the officers knocked on the door to Defendant's home, however, the actions of Defendant and his occupant created exigent circumstances. The audio recordings show that it took approximately two minutes for Defendant to answer the front door. That is an especially long time when the police had information that Defendant is violent (having allegedly beaten his girlfriend with a gun and held her against her will), Defendant allegedly possessed a so-called assault rifle, the police heard loud shuffling in the house before the door was opened, and a five month old infant was believed to be present. The officers acted reasonably and appropriately in unholstering their weapons, handcuffing Defendant when he opened the door, ordering the other occupant out of the premises, and detaining the men on the front porch while the volatile situation was brought under control.

Officer Robinson's initial entry into the house was a proper protective sweep and search for the child in light of the exigencies. While the officers did not initially intend to effect an arrest, they had probable cause to believe a crime had recently been committed in the house, and the situation quickly escalated when the officers heard the moving and shuffling sounds during the two minute delay in opening the front door. The officers were there for a legitimate police purpose: to conduct a knock and talk with Defendant to investigate his girlfriend's accusations and check on the welfare of the child. The officers had reason to fear that other persons might be located within the residence, because one other

occupant was found in the living room and they believed a five month old baby was also present. Officer Robinson's initial entry was brief and cursory, and it lasted only long enough for Officer Robinson to locate the child and to satisfy himself that no one else was in the home.

### B. The Second and Third Entries (Retrieval of Baby Items)

The Government contends that Defendant consented to the officers' next two entries into the home (to get the baby's car seat and to get clothes for the baby). The car seat was in the front room and the baby's clothes were located in Defendant's bedroom. No contraband or evidence was seen for the first time during either entry. (The baggies, marijuana, bulletproof vest and locked doors were spotted in plain view during the initial entry; the rifle and ammunition were not discovered until one of the locked doors in Defendant's bedroom were opened during the officers' fourth entry into the home.) Thus, even if these two entries were illegal, there is no resulting evidence to suppress.

In any event, after a careful review of the audio of the entire encounter, as well as consideration of the testimony at the hearing, the court finds that Defendant did consent to the second and third entries. The audio confirms Defendant and his sister's concerns for the baby and retrieving the car seat and clothes for the baby. It was reasonable for the officers to prohibit Defendant or the sister (or anyone else for that matter) to enter the home until their investigation was complete. Defendant gave implied consent, under these circumstances, when he told the officers where the car seat and clothes were located (Tr. 38)

and voiced no objection to the officers' entry into the home to retrieve the items. Furthermore, given the cold weather on the evening in question, as well as the sister's need to transport the baby in a proper car seat (with sufficient clothing), exigent circumstances justified both of the limited-purpose entries.

### C. Opening the Locked Doors

The more critical issue in this case is whether Defendant consented to the search of the closet (containing the rifle and ammunition) and room (containing the surveillance equipment) behind the two locked doors. Officer Robinson testified that Defendant consented to the search (Tr. 28, 43-44, 51), but Officer Harvey did not overhear that conversation. Tr. 59. However, Officer Harvey testified that he "understood" that Officer Robinson obtained Defendant's consent, and Officer Harvey further testified that he (Harvey) asked Defendant for the keys so the officers could open the padlocks. Tr. 59-60.

Following numerous careful reviews of the audio recordings, the undersigned finds that Defendant did, in fact, consent to search of the areas behind the locked doors. A careful review of the audio does not reflect that the police officers or Defendant used words such as "consent" or "permission" with reference to the locked doors. But the audio quality is poor throughout most of the encounter, and it is possible that consent was expressly requested and obtained but not picked up on the microphones.

The audio does, however, clearly reflect that when Defendant was asked what was "in the two doors with the padlocks on them," he unhesitatingly replied, "Nothing, I can unlock

them." Harvey Video 1, 19:08:50. Then Defendant cooperated with the officers in their attempt to locate the keys. Harvey Video 1, 19:11:50. Once the keys were located but before the locks were opened, one officer asked Defendant if "there were any guns in there." Defendant replied, "no." When the officer asked, "you sure," Defendant made reference to the another officer with the keys to the locks: "There he goes, he's got the keys." Harvey Video 1, 19:13:20.

When considered in context of Defendant's overall encounter with the officers that night, the later statement shows that Defendant – after having freely participated in conversations with the officers about the location of the keys – had no objection to the opening of the locked doors. In other words, Defendant's statement that, "I can unlock them," combined with his other words and actions that night, satisfies the undersigned that Defendant freely and voluntarily consented to the search that resulted in the discovery of the rifle and ammunition.

In his brief (pp. 7-8), Defendant raises the possibility that his initial seizure was illegal and, therefore, any subsequent consent he gave is invalid. Consent to search may, but does not necessarily, dissipate the taint of a Fourth Amendment violation. United States v. Chavez-Villarreal, 3 F.3d 124, 127 (5th Cir. 1993). Evidence obtained due to consent, but after a constitutional violation, will be admitted only if the consent was voluntary and if it was an independent act of free will. Id. This latter requirement focuses on the casual link between the constitutional violation and the subsequently procured evidence. United States

v. Vega, 221 F.3d 789, 801 (5th Cir. 2000). "To determine whether the casual chain was broken, courts consider: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct." Chavez-Villarreal, 3 F.3d at 128. The Government bears the burden of showing admissibility. Id; United States v. Venavides, 291 Fed.Appx. 603 (5th Cir. 2008).

As explained above, the initial detention of Defendant and entries into the home were not illegal. But even if the entries were illegal, considering the amount of time (approximately fifteen minutes) between the initial entry and Defendant's consent to the search of the areas behind the locked doors, the level of Defendant's cooperation with the officers throughout the encounter, and the absence of any flagrant misconduct on the part of the officers, the court concludes that Defendant's consent was voluntary and an independent act of his free will.

Accordingly;

**IT IS RECOMMENDED** that Defendant's Motion to Suppress be denied.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **ten (10) business days** from the date of this Report and Recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 45(b). A party may respond to another party's objections within **five (5) business days** from the filing of the objections.

Counsel are directed to furnish a paper courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED at Shreveport, Louisiana, this 13th day of August, 2009.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE

US v. Minniefield, 09-cr-37

Appendix 1 to the Report and Recommendation on Defendant's Motion to Supress

Notes from the Magistrate Judge's review of the audio/video (DVD)
from patrol cars of Robinson and Harvey

NOTE 1: Unbold text is from Robinson Video 1; **bold** text is from Harvey Video 1.

NOTE 2: These notes are not intended to be a verbatim transcript of the videos, but only a summary of the relevant portions.  They are intended only as an aid to the listener to understand relevant portions of the audio recordings.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**18:51:43: police knock on door; officer:  "police department"; "open the door"**

**18:53: 15: police knock on door again;**

18:53:16: officer:  open the door; step outside; anybody else in house?  Minniefield:  My name is Kevin Minniefield; my id is in my back pocket; faint reference to "my little boy"; Officer:  why did it take you so long to open the door?  Minniefield: Didn't know who you were. Officer:   I said police.

18:55: officer:  ever arrested before?  Where's the weed at?  Don't lie to me.  Minniefield: "I smoked it"

**18:55:12: officer gives Miranda warning**

18:56:50 (radio transmission) Gilliam, Tyrone;

**18:58:45 (radio transmission): Minniefield, Kevin**

18:59: faint sounds of baby crying; crying sounds get louder

**19:00: officer: references to small child; bullet proof vest; federal charges**

19:00: officer:  put your hands behind your back

19:01: officer:  I'll get the (baby's) car seat

**19:02: officer to female: ya'll got the car seat; ya'll need to leave**

19:02:55: officer to unidentified female: ya'll need to go; Minniefield: (to his aunt) can you stay to lock my house up?

**19:03: officer: he is going to have federal charges on him**

19:03: Minniefield: admits he has been advised of his rights; Officer: you're not being arrested, you're being detained

19:03: officer: I saw marijuana in your room; is that your room? Right now, I've got probable cause to search the house; let me know if i'm going to find something;

**19:04:30: officer to female: "ya'll not getting into the house"; officer makes unintelligible reference to a "search warrant" during the conversation with the female**

19:04:30 (officer makes faint reference to a "search warrant")

19:04:33: officer: where the baby clothes at?

19:05: officer (apparently inside house): baggies, scale

**19:06:45: officer: haven't found weapon yet, but got him on possession**

19:06:53: officer: do you see a bag where I can put these baby clothes

19:08:34 officer: (talking to female): what's your name? She responds: _____ Minniefield; Officer: it took him three minutes to open the door; we are assisting another officer

**19:08:50: officer approaches Minniefield, who is in the back seat of patrol car: look man, what's in the two doors with the padlocks on them? Minniefield: "nothing, I can unlock them." Officer: where the key at? On your key ring? Minniefield: can I step out (of patrol car)? Officer: no. Minniefield: I don't know where they are. Might be in my pocket or in my jacket. You mind if I get a t-shirt. Officer: I've got the heater on for you, I'll get something, I'll get you a long sleeve.**

19:09:22: baby is five months old

**19:10:17: officer: That's your sister? Minniefield: Yeah, ask her to give me a hundred.**

**19:10:37: officer to sister: This the keys?  Sister: I have no idea.**

**19:11:50: officer to Minniefield: Silver keys?  Minniefield: Yeah.  Can I have my jacket?**

**19:12:30: officer to sister: He's gonna be at Caddo (Correctional Center).**

**19:13:06 Conversations between male and female officers (very faint): two doors with a padlock; Female officer: He's probably going to have an SKS or AK-47.**

**19:13:20: Officer to Minniefield: Uh, there any guns in there? Minniefield: No.  Officer: You sure?  Minniefield: There he goes, he's got the keys**

19:13:40: I got money, baggies, drugs; I got him on Possession with Intent

19:14:40: officer: "Private conversation" (audio stops)

19:15:59: (Robinson audio resumes); sounds of a search being conducted

**NOTE:  Harvey audio does not resume until 19:28**

19:17: officers:  more baggies; baggies

19:19: officers:  convicted felon; bingo; gun

19:22:44: (officer apparently referring to gun):  loaded?  Yep

19:24:28: (officer describes how he obtained consent):  once I had plain view, I said anything in the house; no; do you mind if I look; no go ahead; he gave us consent, he gave us keys to unlock the doors

19:25: officer:  bullet proof vest

19:26:45 (officer puts SKS rifle on hood of patrol car)

19:27: (officer puts other evidence on hood of car; pink bowl)

19:27:50: (officer puts Defendant in back seat)

19:29: (officer describes evidence): SKS and pound and a half of weed; need camera

19:30: (officers referring to person in back of other patrol car): he's clean; no warrants

19:32: (officers talking): he's going to jail for a very long time

19:34: white female officer shows up on video at front of car; white male plainclothes officer shows up at front of car; says something about the baby's mama

19:35: takes pictures of evidence on hood of car

19:35: faint reference to: he gave consent

**19:35: officers talking: he gave consent, like a dumb ass**

**19:39:55: Officers talking: (faint) He gave us the keys to unlock the doors**